UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VERONICA DEKRUGER,

            Plaintiff,                    Civil No. 08-10410

vs.                               DISTRICT JUDGE VICTORIA A. ROBERTS
                                    MAGISTRATE JUDGE STEVEN D. PEPE

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

            Defendant.

_____/

**REPORT AND RECOMMENDATION**

**I.    BACKGROUND**

Plaintiff brought this action under 42 U.S.C. § 405(g) and § 1383(c)(3) to challenge a final decision of the Commissioner denying both her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, and her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act.  Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED** and the Defendant's motion for summary judgment be **GRANTED**.

**A.    Procedural History**

Plaintiff protectively applied for DIB and SSI on January 16, 2004, alleging that she had been disabled since January 1, 2001 (R. 60-62, 65, 234-236).[1]  After Plaintiff's claim was initially denied on July 2, 2004 (R. 49-53, 237-240), a hearing was held on February 6, 2007,

_____

[1]At Plaintiff's hearing before the ALJ, Plaintiff indicated she would be willing to amend the onset date to her 50th birthday, *i.e.*, December 4, 2004 (R. 284).

before Administrative Law Judge Peter N. Dowd (ALJ) (R. 283-327). Plaintiff was represented by her current attorney, Mikel E. Lupisella. Vocational Expert Roxane Minkus (VE) also testified (R. 314-325).

In a March 28, 2007, decision, ALJ Dowd concluded that Plaintiff was not under a disability as defined by the Act because Plaintiff was capable of performing past relevant work as a companion (R. 18-25). On November 28, 2007, the Appeals Council denied Plaintiff's request for review (R. 4-6).

### B. <u>Background Facts</u>

#### 1. *<u>Plaintiff's Hearing Testimony</u>*

Plaintiff was 52 years old at the time of the hearing (R. 65), and lived with her daughter and grandson (R. 287). She left school in the ninth grade, and never took the General Educational Development (GED) tests (R. 288). Plaintiff receives $311 per month from the State of Michigan to care for her daughter (R. 289), who in 2004 underwent a craniotomy for a brain tumor (R. 297). Plaintiff has a valid driver's license issued by the State of Michigan, and is able to drive, but was issued a handicapped tag by a doctor because of the pain she experienced after walking for five or ten minutes (R. 290-291).

Plaintiff stated that her last period of regular employment ended in 2000 after she was fired from her job as a waitress (R. 291). She was let go because she could not work the number of hours requested of her, and was in a lot of pain which made her irritable and unable to get along with her coworkers or customers. Prior to that, she had worked as a waitress at a different restaurant from 1990 to 1996, but quit after having a disagreement with her supervisor (R. 294). After 2000, she had a number of short work attempts, with her last being in 2006 when she

2

worked one four-hour shift as a janitor (R. 292-293, 309).  She indicated that she would like to work (R. 308), but the reason she cannot hold a job is because everything she does causes her severe pain (R. 298).

Plaintiff admitted that she had a problem with alcohol abuse in the mid-1990's and did have one DUI during that time, but has not had a drink in about ten years (R. 294, 296).  She testified that she has never used illegal drugs (R. 295).

Plaintiff reported that she experiences pain in her back, neck, jaws and legs, for which she was prescribed Vicodin that she takes four times daily (R. 298-300), although she sometimes takes two in the morning if she has housework to do or errands to run (R. 312).  She also indicated that she took Xanax three times a day, and Prozac once daily, both for depression (R. 301).  She had not been seen by a psychiatrist because her insurance would not cover the visits.

Plaintiff typically gets up at 10:00 or 10:30 in the morning and does household chores such as cooking and cleaning (R. 301-302).  She attends church, but has difficulty sitting through the entire service (R. 306).

### 2. *Medical Evidence*

Because Plaintiff only challenges the ALJ's evaluation of her mental impairments, and does not allege any error regarding the ALJ's evaluation of her physical impairments, this Report will focus on Plaintiff's mental condition.

Between October 9, 2002, and December 13, 2004, Plaintiff sought emergency care at Hurley Medical Center twice, at Genesys Regional Medical Center four times, and at McLaren Medical Center twice (R. 112-121, 136-142, 183-233).  She complained primarily of pain in her jaw, neck, back and lower extremities.  She was diagnosed with temporomandibular joint (TMJ)

syndrome (R. 121) and fibromyalgia (R. 137). She also saw Melodie Knicely, M.D., eight times. During her October 6, 2003 visit, Plaintiff complained of both TMJ pain and depression. Dr. Knicely diagnosed a major single episode of depression and prescribed Zoloft (R. 133). She noted in March 2004 that Plaintiff felt a lot better with Prempro and Zoloft (R. 123).

On June 8, 2004, Plaintiff underwent a psychological evaluation performed by Matthew Dickson, Ph.D., a licensed psychologist, at the state agency's request (R. 144-147). Plaintiff told Dr. Dickson that she lived with her daughter and grandson in her daughter's house. She stated that she spent most of her time helping her daughter who had a brain tumor, and was able to cook, clean and do laundry. Plaintiff was independent in self-care and personal hygiene. She was able to do things independently, such as shop for groceries, drive, pay bills and count money.

Dr. Dickson noted that Plaintiff complained of constant pain in her legs and throughout her body, and that she had been depressed throughout her life (R. 144). Plaintiff indicated that she felt down every day, with little motivation to do anything, even getting out of bed. She stated that she was not currently in therapy, denied any previous psychotherapy, or history of psychiatric hospitalization. Plaintiff reported that she last worked in 2003 doing adult foster care, which included cooking and cleaning for the elderly. The job ended after a couple of weeks when she was laid off "probably because [she] couldn't keep up with the work. It was just so hard." Prior to that Plaintiff worked for one day at several locations, but was not able to keep up with the work due to physical pain. She stated that she was fired from her previous job as a waitress because she was "mean to everybody. It got to be where [she] was in so much pain that [she] could not handle it". Plaintiff reported generally getting along okay with her family

4

members, but otherwise avoided social interactions.  She denied spending time with friends.  She was generally cooperative during the examination and was socially appropriate (R. 145).

Dr. Dickson indicated that Plaintiff seemed to be in contact with reality throughout the examination.  Her self-esteem was "low."  She reported recent suicidal ideation, but had never attempted suicide and denied current suicidal intent.  Dr. Dickson also stated that there was no significant evidence of hallucinations or delusions; Plaintiff's speech was unimpaired; and her stream of mental activity was spontaneous and organized.  Plaintiff's affect was appropriate to mood; she reported always feeling depressed; and her mood appeared to be depressed during the exam.  She appeared to be oriented in time, place, and person (R. 146).  Memory testing of Plaintiff showed that she could recall at least five numbers forward and four numbers backward, remember two of three objects after three minutes, name one past president, and correctly identify her birth date.  Dr. Dickson's impression was that Plaintiff's "psychological condition would mildly impair her performance of work related activities."  He diagnosed dysthymic disorder and assessed her Global Assessment of Functioning (GAF) score as 54[2], and her prognosis was guarded (R. 147).

On June 12, 2004, Linda Brundage, Ed.D., a state agency psychologist, completed a Psychiatric Review Technique Form (PRTF) after reviewing the record evidence (R. 148-164).  Dr. Brundage assessed an affective disorder (R. 148), specifically dysthymic disorder (R. 151),

---

[2]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning."  AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed. 1994) at 30.  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *See id.* at 32.  A GAF score of 51-60 is indicative of "[m]oderate symptoms or any moderate difficulty in social, occupational, or school functioning."  *Id.*

and noted that Plaintiff had moderate limitations in her ability to perform activities of daily

living, maintain social functioning, and maintain concentration, persistence, and pace, but had no

extended episodes of decompensation (R. 158).  In addition, Dr. Brundage completed a mental

residual functional capacity (RFC) assessment in which she indicated that Plaintiff was able to

do unskilled work, but may have moderate limitations in memory, concentration, social

interaction, and adaptation due to dysthymia (R. 162-164).

Unlike her earlier emergency room visits where her complaints were predominantly

physical pain, on December 2, 2004, Plaintiff sought emergency room care complaining of

increased depression, as well as TMJ and arthritis pain (R.184).  Yet, she left without being seen

(R. 185).

### *Evidence Submitted After the March 28, 2007, Decision to the Appeals Council[3]*

Plaintiff submitted medical records to be considered by the Appeals Council after the

ALJ had rendered his decision (R. 247-280).  The records, from Mark Gundersen, M.D., are

dated from July 1, 2004, to November 27, 2006, and relate, primarily, to Plaintiff's physical

ailments (R. 248-280).  To the extent that these records address Plaintiff's mental condition, they

will be discussed below.

---

[3]Because this evidence was not before the ALJ when he rendered the final decision of the
Commissioner, it cannot be considered for substantial evidence review.  *See Wyatt v. Secretary
of Health and Human Services*, 974 F.2d 680, 685 (6th Cir. 1992).  The only purpose for which
this Court can consider this additional evidence is to determine whether this case should be
remanded to the agency pursuant to the sixth sentence of 42 U.S.C. § 405(g).  *Cotton v.
Secretary of Health and Human Services*, 2 F.3d 692, 695-96 (6th Cir. 1993).  This Court may
remand the case if the additional evidence is new and material, and if there was good cause for
failure to incorporate the additional evidence into the record at a prior hearing.  42 U.S.C. §
405(g) (sentence six); *See Wyatt*, 974 F.2d at 685; *Casey v. Secretary of Health and Human
Services*, 987 F.2d 1130, 1233 (6th Cir. 1993).

On August 20, 2004, Plaintiff was seen by Dr. Gundersen for back pain and depression. She was considering counseling.  Her antidepressant did not seem to be controlling her depression.  Dr. Gundersen switched her antidepressant to Fluoxetine (R. 267).

On December 16, 2004, Plaintiff stated that she was under stress due to her daughter having brain cancer and going through chemotherapy and radiation therapy (R. 262).  Dr. Gundersen diagnosed Plaintiff with depression and provided her with some samples of Zoloft, a drug she had previously had prescribed.

On January 18, 2005, Plaintiff indicated she wanted to contact Community Mental Health to set up counseling for her depression secondary to her daughter's diagnosis with brain cancer (R. 261).  Dr. Gunderson provided her with the number.

On April 1, 2005, Dr. Gundersen diagnosed Plaintiff with anxiety and provided her with a refill of Ativan (R. 260).  On July 20, 2005, Dr. Gundersen assessed Plaintiff with depression with anxious affect.  Plaintiff received a prescription for Paroxetine and a refill of Xanax (R. 256).  Plaintiff was again diagnosed with anxiety by Dr. Gundersen on September 19, 2005, and November 11, 2005 (R. 254-255).  Both times she received refills for Xanax, and during the November visit she indicated that the Xanax seemed to be controlling her anxiety well (R. 254).

On January 24, 2006, Plaintiff indicated that Paxil did not seem to help her depression, so Dr. Gundersen switched her to Prozac (R. 253).  On April 25, 2006, she stated that she felt that Prozac did not help her depression and she stopped taking it (R. 252).  On July 1, 2006, Plaintiff received a prescription for Elavil from Dr. Gundersen (R. 251).

On October 6, 2006, Plaintiff complained again of depression, and Dr. Gundersen put her back on Fluoxetine and refilled her prescription for Elavil (R. 250).  Plaintiff sought treatment

7

from Dr. Gundersen twice in November 2006.  On November 2, 2006, Plaintiff received a refill for Xanax, and Dr. Gundersen indicated that she had significant problems with depression and anxiety which limited her ability to work (R. 249).  On November 27, 2006, Plaintiff indicated that she had noticed a lot of problems with depression and stress (R. 248).

###    3.    *Vocational Evidence*

VE Minkus characterized Plaintiff's past work as a waitress as a low end semi-skilled occupation (R. 319).  The VE indicated that Plaintiff's past work as a companion was also a low end semi-skilled occupation.[4]  Plaintiff's work as a cashier at the dollar store was low end sem-skilled and at the light exertion level  (R. 320).  Her work as a machine operator was low end semi-skilled and at the medium exertion level.  Finally, the VE indicated that Plaintiff's work as a companion for her daughter was performed at the medium exertion level for a time and then at the light level thereafter (R. 321).

ALJ Dowd asked VE Minkus to consider an individual of the same age, education, and work experience of Plaintiff who can lift a maximum weight of 50 pounds, repetitively lift weights of 25 pounds, stand and walk six of eight hours in a normal eight-hour workday, and push for six of eight hours in a normal eight-hour workday (R. 321-322).  VE Minkus testified that this hypothetical person could perform some of Plaintiff's past relevant work, including companion, cashier/checker, and machine operator, as long as it was not as a heavy or medium level machine operator (R. 322).

---

[4] The VE stated that a companion is "a little bit different than a home health aide" (R. 319).  A companion may "clean, they may fix meals, they may take care of personal, you know daily paperwork for the person, they may accompany them to the doctor, they may just, whatever the person needs" (R. 319-320).

ALJ Dowd then asked the VE to assume that this hypothetical person had mental limitations in terms of being able to understand, remember, and carry out detailed instructions, but can do simple, routine, and repetitive work in a stable work environment without having to work in coordination with or in close proximity to others. VE Minkus stated that assuming such limitations would preclude performing all of Plaintiff's past relevant work, as that work was considered low end semi-skilled, and the ALJ's limitations would restrict the hypothetical person to performing unskilled work (R. 323). The VE noted that this hypothetical person could perform light and medium level unskilled work, including 3,000 cleaner/housekeeper jobs, 6,500 janitorial jobs, and 1,800 mail clerk jobs (R. 323-324).

Plaintiff's counsel asked the VE if an individual was unable to sustain sufficient concentration such that it resulted in that individual being non-productive 20 percent of the time, whether that would preclude work. VE Minkus testified that it would (R. 325).

### 4.    *The ALJ's Decision*

ALJ Dowd found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2007, and had not engaged in substantial gainful activity since January 1, 2001, the alleged onset date (R. 20). Plaintiff's TMJ syndrome and fibromyalgia qualified as severe impairments, though ALJ Dowd opined that her dysthymic disorder was not severe (R. 21). Yet, the severity of Plaintiff's impairments did not meet or equal the requirements of any impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (the "Listing"). ALJ Dowd concluded that Plaintiff had not been under a "disability" within the meaning of the Act at any time from the alleged onset date through the date of his decision (R. 19).

9

ALJ Dowd evaluated the functional limitations resulting from Plaintiff's mental impairment in four areas, as required by 20 C.F.R. §§ 404.1520a and 416.920a (R. 21). The ALJ found that Plaintiff's dysthymia caused at most mild limitations of her activities of daily living and social functioning, as well as mild deficiencies of concentration, persistence, and pace. Also, Plaintiff had not experienced any psychiatric episodes of deterioration or decompensation. In so finding that Plaintiff had only mild limitations in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), he noted that Plaintiff had not received or required continuous psychological or psychiatric care, but rather had only been prescribed Xanax and Prozac for her condition. Additionally, Plaintiff engaged in a wide variety of daily activities, and got along with her family, friends and neighbors. The ALJ allowed that his assessment of Plaintiff was very different from that of Dr. Brundage, but did not believe Dr. Brundage's assessment was supported by the rest of the evidence.[5]

ALJ Dowd found that Plaintiff had the physical residual functional capacity (RFC) for work activities (1) involving lifting and carrying weights of up to 25 pounds frequently and occasionally even higher weights; (2) involving standing and walking six hours out of an eight-hour workday; and (3) involving sitting six hours out of an eight-hour workday. Based on the evidence of record, the ALJ found that although Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms (*i.e.*, pain), Plaintiff's statements regarding the intensity, persistence and limiting effects of the symptoms were not entirely credible (R. 22). The ALJ found that, based on the VE's testimony, Plaintiff was capable of

---

[5]ALJ Dowd makes specific reference to new evidence submitted by Plaintiff's counsel for 2005, 2006, and 2007 (R. 21), yet this evidence does not appear in the record.

performing past relevant work as a companion, because it did not require the performance of

work-related activities precluded by Plaintiff's RFC (R. 24).  Therefore, ALJ Dowd concluded

that Plaintiff was not disabled.

## II.   ANALYSIS

### A.   <u>Standard of Review</u>

In adopting federal court review of Social Security administrative decisions, Congress

limited the scope of review to a determination of whether the Commissioner's decision is

supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Secy' of Health and

Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as

"[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting*

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are

not subject to reversal merely because substantial evidence exists in the record to support a

different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v.*

*Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of

proving the existence of a substantial number of jobs that Plaintiff can perform, other than her

past work, the testimony must be given in response to a hypothetical question that accurately

describes Plaintiff in all significant, relevant respects.  A response to a flawed hypothetical

question is not substantial evidence and cannot support a finding that work exists which the

Plaintiff can perform.  *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779

(6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental

impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987)

(Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may

constitute substantial evidence only if the questions posed accurately portray the claimant's

impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must

state with precision the physical and mental impairments of the claimant."); *Myers v.

Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir.

1975).

## B. <u>Factual Analysis</u>

In her motion for summary judgment Plaintiff argues that this case should be remanded

because substantial evidence does not support ALJ Dowd's decision that Plaintiff's mental

impairment is not severe (Dkt. #10, pp. 8-12). Plaintiff also argues that the ALJ erred in

concluding that she could return to her past relevant work because there was no past relevant

work as a companion in Plaintiff's work history that rose to a level of substantial gainful

employment (Dkt. #10, pp. 6-8).

### 1. <u>*Plaintiff's Mental Impairment*</u>

In order to qualify for disability benefits, Plaintiff initially bore the burden of proving

that she suffered from medically severe impairments that lasted or could be expected to last for a

continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A),

1382c(a)(3)(A), (B); 20 C.F.R. §§ 404.1508, 404.1520(c), 404.1521, 416.908, 416.920(c), and

416.921; *Higgs v. Bowen*, 880 F.2d 860 (6th Cir. 1988). Impairments are "severe" if they

significantly limit a claimant's ability to perform basic work activities.[6]  20 C.F.R. §§ 404.1521(b) and 416.921(b).

An impairment qualifies as not severe when it does not affect the claimant's ability to do basic work activities, regardless of age or vocational background.  *Bowen v. Yukert,* 482 U.S. 137, 152 (1987); *Higgs*, 880 F.2d at 862; *Salmi v. Secretary of Health and Human Services*, 774 F.2d 685, 691 (6th Cir. 1985); 20 C.F.R. §§ 404.1521(a), 416.921(a).  In the present case, the ALJ found that Plaintiff had "severe" impairments consisting of trans mandibular joint disease status post automobile accident and facial surgery and fibromyalgia which caused neck and back pain (R. 21).  The ALJ found that Plaintiff had no "severe" mental impairments.

Plaintiff argues that the ALJ erred in concluding that she had no "severe" mental impairments (Dkt. #10, pp. 8-12), as Plaintiff contends the ALJ erred in not accepting the assessment from Dr. Brundage.  In support, Plaintiff cites to the PRTF completed by Dr. Brundage, in which Dr. Brundage reported that Plaintiff was moderately limited in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace (Dkt. #10, p. 11, referring to R. 158).[7]  Notably, the ALJ considered the PRTF completed by Dr. Brundage, but found that it was not supported by the rest of the evidence, noting

---

[6] Basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b) and 416.921(b).

[7] Although Plaintiff cites to the regulations and case law regarding the weight to be afforded to treating physicians, (Dkt. #10, pp. 8-10), Dr. Brundage is a state agency reviewing physician and not a treating physician.  Accordingly, his opinion should not be given the weight afforded to that of a treating physician.

"particularly the new evidence submitted by [Plaintiff's attorney] for 2005, 2006, and 2007" (R. 21). This is peculiar because the pre-hearing and post-hearing medical evidence submitted by Plaintiff's counsel is all from 2004 (R. 182-200, R. 201-233). Plaintiff's counsel points out there were no records submitted during 2005, 2006, and 2007, and the most recent piece of medical evidence available for the ALJ was a report dated December 13, 2004, when she had bruises and bite injuries from a fight (Dkt. #10, p. 10, referring to R. 2, 232).[8]

20 C.F.R. §404.1520a requires that the ALJ follow a special technique when assessing the severity of mental impairments. Specifically, the ALJ must evaluate the degree of functional loss – using the five-point scale: none, mild, moderate, marked, and extreme – in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §404.1520a(c)(3). The ALJ must take into account:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-16.

20 C.F.R. §§404.1520a(c)(1) requires consideration of "all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings,

---

[8] It is possible that the ALJ's statement regarding the new evidence may have merely meant that because there were no treatment records relating to Plaintiff's mental health submitted by Plaintiff's attorney covering the time period 2005 to 2007, such lack of evidence weighed against Dr. Brundage's assessment.

14

medication, and other treatment."  In addition, 20 C.F.R. § 404.1520a(c)(2) requires that the decision maker consider the extent to which the mental impairment interferes with an "ability to function independently, appropriately, effectively, and on a sustained basis" including "such factors as the quality and level of [ ] overall functional performance, any episodic limitations [and] the amount of supervision or assistance [ ] require[d]."

Much of this analysis was commonly done in the PRTF.  Prior to October 2000, the PRTF was completed at the state agency level and a form was completed by the ALJ and attached to the decision.  SSA revised its regulation in September 2000 and modified 20 C.F.R. §404.1520a(e)(2) to no longer require the ALJ to complete and attach PRTF.  But in place of this the ALJ now must document the application of this §404.1520a(c) technique on the four functional areas in the written decision.

> [T]he written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique.  The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  *The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section*.

*Id.* at § 404.1520a(e)(2)  (Emphasis Supplied).

While ALJ Dowd probably should have classified Plaintiff's mental impairments as severe[9], that labeling error would warrant reversal only if the ALJ did not analyze the

---

[9] The Sixth Circuit has clarified that

an impairment can be considered as not severe, and the application rejected at the second stage of the sequential evaluation process, only if the impairment is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience."

psychological limitations.  Contrary to Plaintiff's contention, the ALJ considered the record evidence on mental limitations and found that it did not support the limitations expressed in Dr. Brundage's PRTF (R. 21).  For instance, the ALJ considered that Plaintiff lived with her daughter and her grandchild for whom she provided care (R. 287, 302).  In addition, Plaintiff testified that she got along with her family, friends, and neighbors (R. 21, 304).  Plaintiff described doing a wide variety of daily activities, such as preparing breakfast, lunch, and dinner, taking care of her grandson, doing laundry, and cleaning, caring for her own personal needs, attending church, and shopping (R. 21, 302-06).  Based on such evidence, the ALJ found that, despite any mental condition, Plaintiff had only mild limitations in her activities of daily living, social functioning, and concentration, persistence, and pace, contrary to Dr. Brundage's assessment (R. 21).[10]  This was consistent with psychologist Dr. Dickson's opinion, who personally interviewed Plaintiff for the state agency and concluded that Plaintiff's psychological condition impaired her ability to work only mildly (R. 146).

Plaintiff's counsel cites Dr. Dickson's June 8, 2004, evaluation, which indicated that Plaintiff had a diagnosis of dysthymic disorder, a GAF of 54, and a guarded prognosis (Dkt. #10, p. 11, referring to R. 147).  Plaintiff argues that a GAF score of 54 is indicative of moderate

---

*Farris v. Secretary*, 773 F.2d 85, 89-90 (6th Cir. 1985) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).  This is consistent with the concurring opinion, Justices O'Connor and Stevens wrote in *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987) that "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits [at step 2] without undertaking this vocational analysis."  *Id.*

[10] Plaintiff also suggests that the ALJ erred by not discussing Dr. Brundage's mental residual functional capacity assessment (Dkt. #10, p. 11).  Yet, the same rationale as discussed for discrediting Dr. Brundage's PRTF would apply to Dr. Brundage's mental residual functional capacity assessment.

16

symptoms or moderate difficulty in social occupational or school functioning, and a guarded

prognosis was on point, since in December 2004, Plaintiff went to McLaren Regional Medical

Center and complained of increased depression (R. 184).  That medical entry is of limited utility

because Plaintiff left before being seen by any treater.

Again, despite reporting a GAF score of 54, Dr. Dickson specifically opined that

Plaintiff's psychological condition would only "mildly impair her performance of work related

activities" (R. 146).  Moreover, Dr. Dickson's examination findings did not suggest moderate

limitations.  For instance, Plaintiff reported generally getting along okay with her family

members, and she was generally cooperative during the examination and was socially

appropriate (R. 144-45).  She told Dr. Dickson that she helped out her daughter who has a brain

tumor, and was able to cook, clean, and do laundry (R. 145).  She was independent in self-care

and personal hygiene.  She was able to shop for groceries independently; she drove; and she

could pay bills and count money.  Plaintiff appeared to be in contact with reality throughout the

examination;

her speech was unimpaired; her stream of mental activity was spontaneous and organized; her

affect was appropriate to mood; her mood appeared to be depressed; she was oriented; and she

had unimpaired judgment (R. 146).  On memory testing, she could repeat 5 numbers forward and

3 numbers backward; recall 2 out of 3 objects after 3 minutes, identify a past president, and

correctly identify her birth date.  Thus, Dr. Dickson's assessment provides support for the ALJ's

decision to give little weight to Dr. Brundage's PRTF, and to find that Plaintiff's mental

condition did not significantly limit her ability to perform basic work activities.

While it is unfortunate the ALJ and state agency evaluators Dr. Dickson and Dr.

Brundage in their June 2004 assessments did not have Dr. Gundersen's records from August 2004 through November 2006 that were provided to the Appeals Counsel, all of those records were available before ALJ Dowd's February 2007 hearing.  But they cannot be considered in this review under the *Cotton* and *Wyatt* holdings.  On the medical record before ALJ Dowd there were very limited medical evaluations or treatment for mental impairments.  Dr. Knicely, whom Plaintiff identifies as treating her for depression as well as TMJ, never checked the box for depression on the many visits (R. 122-133), and indicated Plaintiff improved a lot with Zoloft in her most recent entry (R. 122).  Plaintiff has no evidence of any psychological counseling or hospitalizations.  Given this limited record, ALJ Dowd cannot be reversed on his finding that Plaintiff's dysthymia causes at most mild limitations and his finding it did not preclude work as a companion.

ALJ Dowd proceeded to find that Plaintiff retained the residual functional capacity (RFC) for work activities involving lifting and carrying weights of up to 25 pounds frequently and even

higher weights occasionally; standing and walking 6 hours out of an 8-hour workday; and sitting 6 hours out of an 8-hour workday (R. 21).  Plaintiff does not allege any error regarding the ALJ's consideration of her physical condition, and therefore, has waived her right to challenge the ALJ's physical RFC finding in this regard.  *See Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991).  For the reasons noted above, the ALJ also reasonably found that Plaintiff did not have a mental impairment which significantly limited her ability to perform basic work activities.[11]

---

[11] Plaintiff requests that if this case is remanded, that the case be sent to a different ALJ (Dkt. #10, p. 12).  Yet, such a decision is generally decided by the Agency.  *Travis v. Sullivan*, 985 F.2d 919, 923-24 (7th Cir. 1993) ("The court remanded the case to the Secretary

2.      _**Plaintiff's Past Relevant Work**_

Plaintiff argues that the ALJ erred by finding that she could return to her past relevant work as a companion (Dkt. #10, pp. 6-8).  "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1).

Plaintiff argues that there was no evidence that confirmed that she performed work as a companion at a level of substantial gainful activity (SGA) (Dkt. #10, p. 7, referring to R. 64). She points out that her earnings for 2001, 2003, 2004, and 2005 were all below the level of SGA (_id._).  Accordingly, she argues that she could not return to her "past relevant work" as a companion, because SGA is required in order to have past relevant work.

Assuming Plaintiff is correct that her past work did not rise to the level of SGA, any error made by the ALJ is harmless.  Here, ALJ Dowd found that Plaintiff had the physical residual functional capacity (RFC) for work activities (1) involving lifting and carrying weights of up to 25 pounds frequently and occasionally even higher weights; (2) involving standing and walking six hours out of an eight-hour workday; and (3) involving sitting six hours out of an eight-hour

---

and ordered that a new ALJ be assigned to take the case.  To whom a case should be remanded is generally within the province of the Secretary's responsibility.  After all, when a case is remanded, it is to the Secretary with the Appeals Council acting as the Secretary's designee of his or her duties and powers. _Mullen v. Bowen_, 800 F.2d 535, 537 (6th Cir.1986); _see also_ 20 C.F.R. § 404.983, 416.1483 ("When a Federal court remands a case to the Secretary for further consideration, the Appeals Council, acting on behalf of the Secretary, may make a decision, or it may remand the case to an administrative law judge . . . or return the case to the Appeals Council")."

workday.[12]   As noted above, the ALJ's RFC finding is consistent with a full range of light work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b). As such, the Medical-Vocational Guidelines would direct a finding of not disabled. *See* 20 C.F.R. pt. 404, subpt. P, appendix 2, rule 202.11.

Plaintiff has not challenged the physical RFC finding of ALJ Dowd. Yet, assuming non-exertional limitations, such as the mild limitations caused by her depression precluded use of the grid to direct a finding of not disabled, it could nonetheless be used as a framework for a finding of not disabled so long as the ALJ made findings of a significant number of jobs a claimant could perform and if that finding is supported by vocational expert testimony. Here, in addition to a step four finding that Plaintiff could perform her companion job done in 2001 and currently, he also noted that there are 2,200 such jobs in the lower peninsula of Michigan and 80,000 such jobs nationally as testified to by VE Minkus (R. 24). While Plaintiff's 2001 companion job may

---

[12] The ALJ found that Plaintiff's dysthymia caused at most mild limitations of her activities of daily living and social functioning, as well as mild deficiencies of concentration, persistence, and pace (R. 21). Also, Plaintiff had not experienced any psychiatric episodes of deterioration or decompensation. In so finding that Plaintiff had only mild limitations in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), he noted that Plaintiff had not received or required continuous psychological or psychiatric care, but rather had only been prescribed Xanax and Prozac for her condition. Additionally, Plaintiff engaged in a wide variety of daily activities, and got along with her family, friends and neighbors.

20

not have involved enough hours to constitute substantial gainful employment in step four of the sequential evaluation, there is no similar challenge available that the 2,200/80,000 companion jobs identified by VE Minkus do involve substantial gainful employment. ALJ Dowd's finding that Plaintiff "is able to perform [the companion job] as it is generally performed in the national economy" (R. 24) can be read as a step five finding supported by substantial evidence.

Accordingly, even though Plaintiff's job as a companion does not appear to rise to the level of SGA at step four, and thus should not be considered past relevant work, this Court should still affirm the Commissioner's finding, because the record and ALJ findings support a step five determination that Plaintiff is not disabled. *See NLRB v. Wyman-Gordon,* 394 U.S. 759, 766 n.6 (1969), quoted in *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 547 (6th Cir. 2004) (where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game"); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

### 3. *Evidence Submitted to The Appeals Counsel*

In conjunction with his request for review of the ALJ's decision by the Appeals Council, Plaintiff presented evidence to the Appeals Council, and he relies on some of this evidence to support his claim of disability. Where a party presents new evidence on appeal to the Appeals Council that denies review or to the federal court for the first time, the Court can consider the evidence only to determine if a remand is appropriate under sentence six of 42 U.S.C. § 405(g) for further consideration of the evidence but only if the party seeking remand shows that the new

21

evidence is new and material, and if there was good cause for failure to incorporate the additional evidence into the record at a prior hearing.  42 U.S.C. § 405(g) (sentence six); *See Hollon ex rel. Hollon v. Commissioner of Social Security*, 447 F.3d 477, 483-84 (6th Cir. 2006).

Here, Plaintiff does not cite any of the Appeals Council evidence in her brief nor does she argue that a sentence six remand is in order.  Accordingly, Plaintiff has waived this argument. *See Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991).  Moreover, Plaintiff has failed to show good cause for submitting this evidence after the ALJ's decision.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) ("A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence before the ALJ.").  It is also not likely to have made a difference although Dr. Gundersen stated in November 2006 that Plaintiff had significant problems with depression and anxiety which limited her ability to work (R. 249), he failed to provide any specific limitations, and further, his treatment records do not support any limitation.  Dr. Gundersen is not mental health expert.  Accordingly, this case should not be remanded pursuant to sentence six for consideration of this additional evidence.  Rather, substantial evidence supports the ALJ's decision in this case.

## III.   RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard*

*v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local, 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: February 17, 2009                         s/Steven D. Pepe
Ann Arbor, MI                                    United States Magistrate Judge


Certificate of Service

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 17, 2009 .

                                                s/Jermaine Creary
                                                Deputy Clerk

23